## SHOFNER v. SHOFNER et al.

No. 9965.

Court of Civil Appeals of Texas. San Antonio.

April 7, 1937.

Rehearing Denied May 19, 1937.

Willett Wilson and Fulbright, Crooker & Freeman, all of Houston, and Line-

baugh & Guittard, of Victoria, for appellant.

Proctor & Proctor, J. W. Ragsdale, and Crain & Vandenberge, all of Victoria, for appellees.

MURRAY, Justice.

This is a contest of the validity of a purported will alleged to have been executed by W. A. Shofner.

The contest was prosecuted by Reynolds Shofner, one of the sons of W. A. Shofner.

W. A. Shofner died on January 26, 1935, in Calhoun county, leaving a very large estate. The purported will was executed on October 14, 1933. W. A. Shofner had been married three times. Reynolds Shofner was the son by the first marriage; Mildred Lee and Sanford Shofner were children by the second marriage. Mrs. Athol Shofner, his third wife, survived him, but there were no children of the third marriage.

The purported will gave to Reynolds Shofner the sum of $5,000, to Athol Shofner and Mildred Lee Shofner a one-fourth interest, each, in his estate, and the remaining one-half was given to Sanford Shofner.

After a hearing in the county court, the will was admitted to probate, and this appeal is by Reynolds Shofner from a judgment in the district court also probating the will.

The probate of the will was contested on two grounds; the first being want of mental capacity on the part of W. A. Shofner to execute a will, and, the second, that the will was procured by the undue influence of the three favored beneficiaries, Athol Shofner, Mildred Lee Shofner, and Sanford Shofner. The first ground of contest is abandoned, and only the second ground is insisted upon in this appeal. The trial in the district court was before a jury, but, at the close of the testimony for both contestant and contestees, the trial judge instructed a verdict in favor of contestees, and judgment was rendered probating the will. The question presented by this appeal is whether or not the evidence was sufficient to require that the district court submit to the jury the issue of undue influence.

There was a great deal of testimony introduced by both sides. There was testimony to the effect that W. A. Shofner had become weak and feeble, in both mind and

body, so as to be easily susceptible of being unduly influenced by the appellees, Athol Shofner, Mildred Lee Shofner, and Sanford Shofner. A great deal of this testimony consisted of declarations of the testator, W. A. Shofner, as to the condition of his health. He stated on one occasion that he had been a mighty good man physically but that he was now in very bad health; on another occasion, that his memory was bad and that it seemed as though he could not remember anything, and that though he at one time had been very good in his figures, he was now afraid to rely on himself and called on others to check his figures. The evidence further shows that he had received a leg injury and walked with a cane; and that a doctor who examined him at one time found him to be a prediabetic.

The evidence further shows that the appellees resided in the same house with the testator, while the appellant did not do so; that appellees were able to dominate and control the mind of testator in various business affairs, and compel him to do many things that he did not want to do; that on one occasion he did not want Sanford Shofner to buy a fine saddle horse, but ultimately gave in and permitted him to do so; that on one occasion he had held some cotton which he and Sanford had purchased as partners, and as a result of holding the cotton the partnership had sustained a loss, and that testator stated that he did not want to hold the cotton, but Sanford had forced him to do so; he also stated that due to the fact that he and Sanford were partners he could not always do what he would like to do.

There was also evidence that the appellees did not treat appellant kindly when he was at the home of his father; that appellant resided with his father prior to his marriage, and that his stepmother and half sister and half brother ridiculed him, made fun of the enormous appetite which he possessed; and that his stepmother called upon him to do the chores about the house, requiring him to mow the lawn, wash the automobile, and do other menial labor, which his half brother, Sanford, was not called upon to do; that he was accused of tracking mud into the house and leaving his clothes lying on the floor. As a result of this and similar treatment he left his father's home and resided elsewhere. That regardless of these matters his father always felt very friendly and sympathetic toward him. It was also shown that the testator made statements indicating that it was his intention to treat his children equally in the division of his estate and that each would have an equal portion thereof. Appellant was treated as though he was not the social equal of the other members of the family. It was shown that the property acquired during the lifetime of appellant's mother formed a substantial basis for the accumulation of the estate left by the testator, but that Mrs. Athol Shofner had stated to appellant that he had no interest in his father's estate and never would have any. Testator consulted Sanford about his business affairs and would often state that he would have to see Sanford before he could close certain business deals. It was also shown that Sanford Shofner had procured appellant to sign a release of his interest in his deceased mother's estate, upon the representation that his father had made a will in which appellant would share equally with the other children; that Sanford boasted that he could get his father to do anything he wanted him to do; that Sanford Shofner repeatedly committed acts of hostility toward appellant; that when appellant learned of his father's illness he wanted to see his father and was first advised not to come in, but was afterwards permitted to see his father in the presence of appellees and was not permitted to see his father alone. It was further shown that testator knew that his other children would have a large inheritance from their mother's interest in the community estate, while appellant had nothing and no opportunity to inherit other than through his father.

It was further shown that after testator had executed the will in question he expressed dissatisfaction therewith by declaring, in the presence of several witnesses, that he wishes his will had been as easy to make as Mrs. Price's; that his will was not worth the paper it was written on and would not stand up in any court if contested.

Appellees offered testimony by many prominent citizens in Calhoun county, to the effect that testator was a vigorous and aggressive business man up until the time of his last sickness; that he was a man 65 years of age, of strong will and determination, and was a man whom it would be hard for any one to influence; that testator believed that his son, Reynolds, appellant herein, was a spendthrift and of a shiftless disposition; that he could not

depend upon him or promises made by him, and that approximately one month before the execution of the will appellant had employed an attorney in Houston, Tex., to bring suit against his father for his mother's interest in the estate, which his father deeply resented. It was further shown that J. W. Ragsdale, Esq., was testator's lawyer, and that he frequently consulted him about business transactions; that on the day of the execution of the will testator appeared at the law office of J. W. Ragsdale, Esq., in the city of Victoria, and there related to his lawyer the fact that he desired to make a will and the provisions to be inserted in the will; that no one came with testator to the law office, and that no one was present at the time the will was written, except the attorney and his stenographer. That testator read over the will after it had been dictated and stated that he was satisfied with it, and thereupon duly executed it, and his attorney and the stenographer witnessed the will at the request of testator. Testator then left the will in the safe of his lawyer, where it remained until after the death of testator. It is not shown that any one except testator and the attesting witnesses to the will ever knew the contents of the will until after the death of W. A. Shofner.

The trial court held, in effect, that the above testimony did not raise the issue of undue influence, and instructed a verdict in favor of appellees. We are of the opinion that there was no error in the directed verdict. Many of the statements attributed to W. A. Shofner were introduced in evidence over the objection of appellees, and cannot be considered as competent original evidence to show undue influence. Jones on Evidence, p. 493, § 329; Id., p. 748, § 483. In the last section cited we find the following language: "Declarations of the character treated in the last section are admissible only for the purpose of proving the mental condition of the testator. They afford no substantive proof of fraud, duress, or undue influence, and are admissible for no such purpose. There must be independent proof and evidence exclusive of such declarations." Besteiro v. Besteiro (Tex.Civ. App.) 45 S.W.(2d) 379; Id. (Tex.Com. App.) 65 S.W.(2d) 759; Pierson v. Pierson (Tex.Civ.App.) 57 S.W.(2d) 633, 636.

When the testimony offered by appellant is stripped of the declarations of the testator, which cannot be considered as original evidence to show undue influence, it amounts to nothing more than a showing of an opportunity to have exerted undue influence upon the testator. Brodt v. Brodt (Tex.Civ.App.) 91 S.W.(2d) 837; Stolle v. Kanetzky (Tex.Civ.App.) 259 S.W. 657; Pierson v. Pierson, supra.

Furthermore, the evidence does not show that the alleged undue influence operated on the testator at the very time he executed the will in such manner as to make the will not that of the testator but of some one else. It is the law that the undue influence must be shown, either by direct testimony or circumstantial evidence, to have operated upon the mind of the testator so strongly that he was prevented from exercising his own will, but rather compelled to accept the will of another. In other words, it must be shown that he in effect said to himself, "It is not my will, but I must do it." Pierson v. Pierson, supra.

The only testimony that could have any bearing upon this proposition is that testator had stated that he was being nagged by the members of his family prior to the execution of his will about his business affairs, and that after he had executed the will he had stated that the members of his family were killing him with kindness. We think that this, when considered in the light of all the other testimony, could not be construed as a circumstance of sufficient probative force to establish the fact that the execution of the will was procured by the undue influence of appellees. The record does not even show that appellees knew of the execution of the will or of its contents. It does not show that either of appellees ever mentioned to testator the execution of a will, or what it should contain. The burden of proof was upon appellant to show by the preponderance of the evidence that the actual execution of the will was the result of undue influence exerted upon testator by the appellees at the very time he executed the will. The evidence is wholly insufficient to meet this burden placed upon appellant. The evidence is such that reasonable minds could not differ on the issue raised, and, had the jury found on the evidence in this record that the will involved was executed as the result of undue influence practiced by appellees upon the testator, such a verdict would not have been justified by the evidence and would not have been permitted to stand by any

court. We therefore conclude that the trial court properly directed a verdict for the appellees, and, accordingly, the judgment will be affirmed.