### HAGER et al. v. HAGER et al.

### No. 1894.

Court of Civil Appeals of Texas. Eastland.

April 7, 1939.

Stinson, Hair, Brooks & Duke, of Abilene, for appellants.

Coombes & Andrews and E. V. Hardwick, all of Stamford, for appellees.

GRISSOM, Justice.

This is an appeal from a judgment based upon an instructed verdict for defendants. The suit was instituted by Henry Hager, et al., against Leonard L. Hager and D. E. Prewit for the purpose of canceling a deed executed by Sallie A. Hager to Leonard L. Hager conveying two tracts of land and a deed to the same land from Leonard L. Hager to D. E. Prewit. D. B. Hager, the father of the defendant Leonard L. Hager, and father of some, and grandfather of others, of the plaintiffs, died April 8, 1933, leaving a written will by which he devised and bequeathed all his property to his wife, Sallie Hager. The land conveyed by Sallie Hager to Leonard Hager was acquired during the marriage of D. B. Hager and Sallie A. Hager. The inventory and appraisement filed in the estate of D. B. Hager, deceased, by Mrs. Sallie Hager, independent executrix of his estate, showed he owned, as his separate property, an undivided ¼ interest in 159 acres of land,

his interest therein being valued in the inventory at $1,500. His ½ interest in the community property belonging to D. B. Hager and Sallie A. Hager was listed and valued in the inventory as follows: An undivided ½ interest in 349⅕ acres of land, valued at $6,000; ½ interest in a city lot, valued at $500; ½ interest in 8 head of work mules, farming tools and equipment, valued at $600; cash in bank, $39.51; ½ interest in the household and kitchen furniture, etc., valued at $500; ½ interest in automobile, valued at $300. D. B. Hager's interest in all said property being valued in the inventory at $9,439.31.

Under the list of claims owing to the community estate is found this statement: "Various and sundry notes executed by the children of deceased and the above named executrix, most of which are barred by limitation and none of which are considered as of any value."

On July 16, 1934, Mrs. Sallie A. Hager executed a deed to Leonard L. Hager to said two tracts of land, aggregating 240 acres. The consideration recited was $1 paid "and the further consideration of the assuming payment by the said Leonard L. Hager of the balance due on that certain loan debt made by D. B. Hager and Sallie A. Hager to John Hancock Mutual Life Insurance Company, said indebtedness being originally in the sum of $3500, said indebtedness being secured by a valid deed of trust lien on the land herein conveyed; the said Leonard L. Hager assuming the entire balance due on said debt, principal and interest * * *."

The deed to Leonard L. Hager was filed for record July 17, 1934, and recorded in the Deed Records of Jones County, Texas, wherein the land was situated. Mrs. Sallie A. Hager died March 27, 1937, intestate. On April 19, 1937, Leonard L. Hager conveyed said land to D. E. Prewit. On August 26, 1937, this suit was filed. Plaintiffs and defendant Leonard L. Hager constitute all the children and heirs at law of D. B. and Sallie A. Hager, deceased. The grounds upon which plaintiffs sought to cancel the deed from Sallie Hager to Leonard L. Hager, and the deed from Leonard L. Hager to D. E. Prewit were: (1) Lack of mental capacity in Mrs. Hager to execute the deed to Leonard L. Hager; (2) undue influence of Leonard L. Hager alleged to have been exerted upon his mother, causing her to execute the deed, and (3) that Prewit had notice of the rights

and claims of plaintiffs when he bought the land from Leonard L. Hager. Defendant Prewit answered by general denial and specially pleaded that he was an innocent purchaser for valuable consideration without notice of the rights or claims of plaintiffs. In substance, he further alleged that plaintiffs were estopped from asserting the invalidity of the deed to him because Mrs. Hager executed her deed to Leonard L. Hager on July 16, 1934, that it was filed for record July 17, 1934, and Mrs. Hager lived until March 27, 1937; that Mrs. Sallie Hager and plaintiffs, during said period, remained silent and took no steps to cancel said deed, etc. Defendant Hager answered by general denial, and adopted the special plea of his co-defendant Prewit. At the conclusion of plaintiffs' testimony, the court instructed the jury to return a verdict for defendants, which was done and judgment entered for defendants.

The evidence did not raise an issue as to the alleged mental incapacity of Mrs. Hager at the time of the execution of the deed, and the attack upon said deed on that ground was abandoned by plaintiffs upon this appeal. The questions presented are: (1) Was there evidence of undue influence requiring submission of such issue to the jury? (2) Was there evidence that Prewit was not an innocent purchaser for value without notice requiring submission of such an issue to the jury? Dixon v. Cargill, Tex.Civ.App., 104 S.W.2d 101, writ ref. It is apparent that the deeds could not be canceled without proof of both of said issues.

We will attempt to quote or state the substance of all the evidence favorable to plaintiffs that may be pertinent upon the issue of undue influence and innocent purchase, for value, without notice. Mrs. Burk testified that she visited Mrs. Sallie Hager:

"A. Well sir, it was in 1934, about June 16th.

"Q. State whether or not anyone else was present, when you and Mrs. Long was there? A. No, just Mrs. Hager and Leonard.

"Q. Mrs. Hager, Leonard and Mrs. Long? A. That's what I say, yes sir.

"Q. State whether or not you heard Mrs. Hager and Mr. Leonard Hager have any conversation? A. Yes, I heard Mrs. Hager ask him if he would move on the farm with her. He said no, unless she would deed everything over to him. She said she didn't feel like she was doing right by the other children—* * *

"A. She asked him and said, 'Well, if you will move out on the farm with me, you can have all it made. I have got to have someone to stay with me and take care of it.' He said he would not do that, unless everything was deeded over to him, and she said she didn't want to do that, but she guessed she would have to, to have someone to take care of her.

"Q. Did she say anything about having peace? A. Yes, she said she guessed she would have to do it, to have peace.

"Q. State whether or not you had occasion to notice whether she was sick or well? A. No, she wasn't well; confined to her bed; up and down.

"Q. Will you tell the jury where you and Mr. Leonard Hager and his mother were at that time? Was it in the house? A. Yes sir.

"Q. I wish you would tell where you all were. A. I was sitting in the door that went from the bedroom to the dining room. They were in the bed room. Mrs. Long was cooking dinner. * * *

"Q. How did that happen to come up, between Leonard and Mrs. Hager? A. She just asked Leonard if he was going to move out on the farm with her.

"Q. How long was he there? A. He was there until they got dinner ready, about thirty-five or forty minutes.

"Q. Did you hear any other conversation with her? A. I did not.

"Q. That's the only thing? A. That's the only thing. He just said he wasn't going to move out on the farm, until she had deeded everything to him.

"Q. What time of day did this conversation occur? A. I guess about eleven to eleven-thirty.

"Q. And they stayed there from eleven to twelve? A. Might have been before twelve. I never noticed.

"Q. With respect to the parties, did you keep the position you had all of that time, sitting in the door in the dining room? A. What do you mean? Did I sit there all the time?

"Q. Yes. A. Well, not all the time.

"Q. Mrs. Long was cooking dinner? A. She was seeing about dinner; she wasn't in there all the time.

"Q. There wasn't anybody in the bedroom except Leonard and Mrs. Hager? A. That's all.

"Q. During that time, is that all of the conversation that you happened to hear between them? A. Yes, just what I told you.

"Q. You don't recall anything else that was said between them? A. No.

"Q. They stayed there an hour, and they were talking all of that time, weren't they, Mrs. Burk? A. Something like an hour; might not have been that much.

"Q. So they evidently talked about other things? A. This other conversation, about moving out to the farm, to deed it to him. She told him she didn't think it was right to deed it all to him. She thought as much of one child as she did the other.

"Q. But that was all the conversation you heard between them, during that hour? A. That's all I heard."

Mrs. C. P. Hager, wife of one of the plaintiffs, was asked whether her daughter by a former marriage stayed with Mrs. Sallie Hager any, and if so, why. She testified:

"A. She did. She stayed with her more of the week ends, than any other time. The first half of the year we were married, she stayed with me and went to school; and the second or middle term, she stayed with her mother, and Mrs. Hager asked that she stay with her at nights, so if Leonard Hager didn't come home, she wouldn't be by herself. And lots of times, Leonard Hager didn't show up.

"Q. After that, did she go to the sanitarium—your mother-in-law? A. She did.

"Q. When did she go to the sanitarium? A. She went to the sanitarium in May of the following year, and she stayed there around a month, I think. And then she went back to the farm and stayed there until they moved to town. She taken her bed about Thanksgiving and then went to the sanitarium, and then taken her bed and never left.

"Q. During the time she was at the sanitarium, did you visit her? A. Yes sir.

"Q. Did your husband go? A. He did.

"Q. How often were you there? A. The last three weeks she was there, we sat up nearly every night, and the last two weeks, we sat up with her every night, and often there in the day time.

"Q. Did you sit up there with her? A. I did.

"Q. Did your husband stay there with her? A. Yes sir.

"Q. Did you see Leonard there? A. I can recall four times he was there, in the last eight weeks.

"Q. State whether or not you can recall any conversation between Leonard Hager and Mrs. Hager, with reference to a paper? A. Yes sir. * * * Well, I was out at the hospital one afternoon, it was along about twelve o'clock, and Leonard was out there. So she told Leonard—he was in the room there—she told him that she would sign some kind of a paper and she knew she wasn't going to get well. She wanted him to tear that paper up and destroy it, because she loved all her daughters just the same, and she wanted them to all have equal parts, for what they had worked for.

"Q. She said she wanted him to destroy it? A. Yes sir.

"Q. When was the first time that you did ever hear of this purported deed, that was executed by her in 1934? A. Not till after the property was done sold." ·

With reference to notice to Prewit, she testified:

"A. He [Mr. Prewit] came out to the house about two weeks after Mrs. Hager died, and he asked my husband if he would sign a paper about paying rent. Buster said 'What rent?' He said he bought the place, and wanted Buster to sign a paper to pay rent. Buster said he wouldn't sign no paper. Buster said 'Who was selling the property?' He said, 'Leonard Hager'. Buster said he couldn't do that; that the rest of the heirs had as much right to sell it, as he did; that he couldn't sell that property.

"Q. Did Mr. Prewit say anything then? A. No, he drove off."

The evidence is sufficient to support a finding that said conversation occurred prior to the receipt of the deed by Prewit.

Mrs. Sallie Hager was 65 or 66 years of age at the time of her death. Plaintiffs did not have actual knowledge of the execution of the deed by Mrs. Sallie Hager to Leonard Hager until after Mrs. Hager's death. Mrs. Hager stated to several persons that she loved all her children alike. She was in the sanitarium for two months immediately prior to her death.

"Undue influence, as well as fraud, is a ground for avoiding a deed.

The influence for which a deed may be set aside has been defined as such pressure or persuasion as, exercised at the time, under the facts and circumstances of the case, destroys the free agency of the grantor and substitutes therefor the will of another. In other words, it is not sufficient that the influence has in some measure destroyed the free agency of the grantor, but his will must have been overcome and supplanted. Furthermore, the influence must not only have existed but it must also have been exercised for an undue *and disadvantageous purpose;* both these points must concur to produce the effect of avoidance." 14 Tex. Jur. sec. 88, pp. 858, 859. (Italics ours.)

"No presumption of fraud or undue influence arises from the fact that a parent makes a deed of gift to his children, for 'nothing is more common or natural than for a father to bestow gifts upon his children.' Neither does the fact that some of the grantor's children or grandchildren are excluded from his bounty in itself prove the exercise of such influence." 14 Tex. Jur. p. 863.

See Stewart v. Miller, Tex.Civ.App., 271 S.W. 311, 316; Rankin v. Rankin, 105 Tex. 451, 456, 151 S.W. 527.

In Besteiro et al. v. Besteiro et al., Tex. Com.App., 65 S.W.2d 759, 761, 762, the court said:

" 'It is well settled that, in order to avoid a will on the ground of undue influence, it must appear that the testator's free agency was destroyed, and that his will was overcome by excessive importunity, imposition, or fraud, so that the will does not, in fact, express his wishes as to the disposition of his property, but those of the persons exercising the influence.' Trezevant v. Rains et al. (Tex.Sup.) 19 S.W. 567, 570. The same rule ought to be applied to the deed here involved.

\* \* \* \* \* \*

"The undue influence which will vitiate a will must be exercised at the time of its making. Holt v. Guerguin [Tex.Civ.App., 156 S.W. 581], supra. We think the same rule applies to the deed in question. In this connection we hold that, if there was evidence to show that either Maria Inez or Rosalia had unduly influenced the execution of this deed by acts done or things said prior to its execution, and that such acts done or things said operated unduly on the mother's mind, so as to destroy her free agency at the time the deed was actually executed, then it could be said in law that such undue influence was exercised at the time of the execution of the deed.

"Where a deed, otherwise valid, is attacked on the ground of undue influence, the burden is on the party making the attack to both plead and prove that such deed is the product of such influence.

\* \* \* \* \* \*

"It is absolutely impossible for any court or law writer to lay down a hard and fast rule by which the legal sufficiency of facts to establish undue influence in the making of a deed can be measured. In this respect each individual case must stand on its own bottom. It is, however, certainly necessary for the attacking party to introduce some tangible and satisfactory proof, direct or circumstantial, that the grantor's free will has been overcome by the undue influence alleged, so that the deed does not in fact express his (grantor's) wishes, as to the disposition of his property, but the wishes of the person exercising the undue influence."

In Shofner v. Shofner, Tex.Civ.App., 105 S.W.2d 418, 420, writ ref., it was said: "It is the law that the undue influence must be shown, either by direct testimony or circumstantial evidence, to have operated upon the mind of the testator so strongly that he was prevented from exercising his own will, but rather compelled to accept the will of another. In other words, it must be shown that he in effect said to himself, 'It is not my will, but I must do it.' "

After careful consideration of all the testimony we are convinced that undue influence was not shown. The burden of proof was upon the plaintiffs to show by a preponderance of the evidence that the actual execution of the deed in question was the result of undue influence exerted upon Mrs. Sallie Hager by Leonard L. Hager. The evidence is such, we think, that reasonable minds could not differ on that question, and had the court submitted the issue to the jury and the jury found that Mrs. Hager was unduly influenced to execute the deed, such a verdict would not have been justified and no court would have permitted it to stand.

Plaintiffs' evidence shows that Mrs. Hager instigated the proceedings or trade consummated by the execution and delivery of the deed. There is no evidence that Leonard Hager importuned or urged the

execution of the deed. The testimony relative thereto was simply that Mrs. Sallie Hager desired that Leonard Hager move to the farm and live on it with her. He simply declined to do so, according to plaintiffs' testimony, unless *everything* was "deeded" to him. Apparently only a portion of Mrs. Hager's property was conveyed to Leonard Hager. There is no evidence that Mrs. Hager did not make a trade advantageous to her in conveying the land to her son Leonard in consideration of the payment of $1 and the assumption of the indebtedness against the property conveyed. The value of the land in 1934 is not shown. The amount of the debt secured by a lien thereon is not definitely shown. There is not a scintilla of evidence that Mrs. Hager was under the domination and control of her son Leonard.

Undue influence cannot be presumed or inferred from opportunity or interest. It must be proved in some manner to have been exercised in relation to the execution of the deed. Pierson v. Pierson, Tex.Civ.App., 57 S.W.2d 633, writ ref. It is essential to prove not only that Leonard Hager had influence with his mother, but that it was unduly exercised, and that it subverted and overpowered Mrs. Hager's will causing her to execute the conveyance in question and but for the exercise of which she would not have executed it. Stewart v. Miller, Tex.Civ. App., 271 S.W. 311, writ ref. "In order to avoid a deed on the ground of undue influence it must be shown that the influence existed, and was exercised for an undue and disadvantageous purpose." Beville v. Jones, 74 Tex. 148, 153, 11 S.W. 1128, 1130.

The testimony with reference to Mrs. Hager's statement to Leonard while she was in the hospital shortly before her death, and about three years after the execution of the deed by her to Leonard, to the effect that she wanted Leonard to tear up and destroy some paper "she would sign" because she "knew she wasn't going to get well", "because she loved all her *daughters* just the same, and wanted them to all have equal parts for what they had worked for",

is, we think, entitled to no weight on the issue of undue influence. If Mrs. Hager had reference to the deed to Leonard Hager, it affected all her children, not her daughters alone. The language of the witness is that Mrs. Hager said to Leonard "* * she *would* sign some kind of a paper and she knew she wasn't going to get well." We think it cannot be inferred that the paper Mrs. Hager referred to was the deed executed to Leonard Hager about three years prior thereto. If she was perfectly rational at said time, and plaintiffs' testimony is that she was, the most reasonable inference would be that the paper she desired that Leonard destroy was one relating to her daughters alone. To infer that she referred to said deed would be to base inference upon inference, which the court is not authorized to do. We think appellees correctly state the situation thus: "The inference would first have to be drawn that the instrument referred to affected all of her children and then infer from that influence that she referred to the deed in question." This we are not authorized to do. Craycroft v. Crawford, Tex.Com.App., 285 S.W. 275, 282.

We are convinced that plaintiffs' evidence on the issue of undue influence is not nearly so strong as the evidence relative thereto in the authorities hereinafter cited wherein it was held that the trial court properly instructed a verdict for the defendant, or that the evidence was insufficient to sustain a verdict for the plaintiffs. Shofner v. Shofner, Tex.Civ.App., 105 S.W.2d 418; Pierson v. Pierson, Tex. Civ.App., 57 S.W.2d 633; Stewart v. Miller, Tex.Civ.App., 271 S.W. 311; Besteiro v. Besteiro, Tex.Com.App., 65 S.W.2d 759; Id., Tex.Civ.App., 45 S.W.2d 379; Id., Tex.Civ.App., 18 S.W.2d 829.

For the reasons indicated we hold that the court did not err in refusing to submit to the jury the issue of undue influence and in instructing a verdict for defendants. Under such conclusion, the issue as to notice to Prewit becomes immaterial and will not be discussed.

The judgment is affirmed.